```
IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF SOUTH CAROLINA
           CHARLESTON DIVISION
```

RENE CARDOSO,

        Plaintiff,

    v.                  No. 2:16-cv-1058-PMD

MITCHELL MECHANICAL, L.L.C.,

        Defendant.

---

VIDEOCONFERENCE DEPOSITION OF

JULIE SAWYER-LITTLE

11:00 a.m. - 1:45 p.m.

June 28, 2017

Durham, North Carolina

Reported By: Joseph C. Spontarelli, CCR

A. WILLIAM ROBERTS, JR. & ASSOCIATES
Fast, Accurate & Friendly

| Charleston, SC | Hilton Head, SC | Myrtle Beach, SC |
|---|---|---|
| (843)722-8414 | (843)785-3263 | (843)839-3376 |
| Columbia, SC | Greenville, SC | Charlotte, NC |
| (803)731-5224 | (864)234-7030 | (704)573-3919 |

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO
scheduledepo.com

30

1  and vocational.  Dealing specifically with the
2  medical information I assume you obtain copies
3  of medical records.
4        A    Yes.
5        Q    You said that you call treaters.
6  What treaters have you talked with in
7  connection with this case?
8        A    I consulted with Dr. Taub and Dr.
9  White.
10       Q    Why did you consult with those two as
11 opposed to any of the others that might have
12 been involved?
13       A    Those are his current providers.
14       Q    Did you think it was not necessary to
15 talk to any of the other doctors involved in
16 this case?
17       A    No.
18       Q    No you didn't think it was necessary,
19 is that correct?
20       A    That's correct.
21       Q    And why not?
22       A    Because there have been no current
23 treatment by those providers.  When I looked at
24 the period over the last couple years he
25 continues to be treated primarily by Dr. Taub

Cardoso, Rene v.
Holder Construction Company, et a
Julie Sawyer-Little
June 28, 2017

31

1   and then has recently started being treated by
2   Dr. White.
3       Q    Do you know how he came to be treated
4   by Dr. White?
5       A    Can you repeat that?
6       Q    Do you know how it was that he came
7   to be treated by Dr. White?
8       A    I don't.
9            We may have to disconnect and
10  reconnect.
11      Q    Are we having problems?
12      A    Yes.  It's not just me.  The court
13  reporter is having difficulty as well.
14           MR. REEVES:  That's fine.
15           MR. LAIL:  Phil, give us a second.
16  I'm going to get the gal and see if she can get
17  the audio better for us.
18
19           (Recess.)
20
21  BY MR. REEVES:
22      Q    Ms. Sawyer-Little, we were talking
23  about the treaters that you had talked with and
24  you mentioned that it was just Dr. Taub and Dr.
25  White, and that you didn't think it was

```
 1  BY MR. REEVES:
 2       Q     Not at all?
 3       A     No.  Not in regards to the type of
 4  work he did, no.
 5       Q     He also indicated that he had a
 6  fairly good command of the English language but
 7  admits he's not as strong in reading English.
 8  Does his inability to read English as well play
 9  any part in his employability?
10       A     It potentially would for jobs that
11  are less exertional in nature.
12       Q     Obviously if those jobs exist and he
13  can do them then he would be able to work,
14  correct?
15             MR. LAIL:  Object to form.
16             THE WITNESS:  Ask that one more time.
17  BY MR. REEVES:
18       Q     If there were jobs that were less
19  exertional than the job he was doing then by
20  definition he would be able to work, correct?
21             MR. LAIL:  Object to form.
22             THE WITNESS:  If that was the only
23  criteria that we were looking at, yes.
24  BY MR. REEVES:
25       Q     He also gave you some information
```

57

1  concerning his work history, and he indicated
2  that he began working with Hartland Resources
3  as an electrician in 2008 and was making $19 an
4  hour, is that correct?
5      A    Correct.
6      Q    What did you do to verify that
7  information?
8      A    In the 2015 report I was provided
9  with the Statement of Compensation from the
10 workers' comp provider.
11     Q    You say you were provided.  Who
12 provided that to you?
13     A    Mr. D'Agata, the attorney in
14 Charlotte.
15     Q    Did you do anything to determine how
16 that wage had been calculated?
17     A    It was calculated on there.  It
18 showed based on his earnings what his weekly
19 and hourly rate was.
20     Q    Did you ask for or receive any other
21 documentation from Mr. Cardoso concerning his
22 work history?
23     A    I don't believe so.
24     Q    Other than the information that you
25 got from the workers' compensation carrier do

65

1    THE WITNESS: I consulted with the
2    current providers.
3    BY MR. REEVES:
4        Q    But you didn't consult with all of
5    them did you?
6        A    No.
7        Q    You have a chart in your report. It
8    say occupation, hourly rate, annual salary
9    range. It says electrician. Why did you use
10   electrician as the occupation that you
11   surveyed?
12       A    Because my understanding in getting
13   information from him and also analyzing the
14   task that he did that he was basically working
15   as an electrician under a licensed electrician
16   on-site.
17       Q    The occupation that you looked at
18   which is electrician, was it a licensed or
19   unlicensed electrician?
20       A    In the BLS and ESC data it doesn't
21   designate that.
22       Q    Can you say that again?
23       A    Sure.
24           In reviewing the Bureau of Labor
25   Statistics and the North Carolina data it